UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ZHI MING ZHANG,

                Petitioner,

       v.

KENNETH GENALO, New York City Field
Office Director, U.S. Immigration and
Customs Enforcement, KRISTI NOEM,
U.S. Secretary of Homeland Security;
PAMELA BONDI, U.S. Attorney General,

              Respondents.

**MEMORANDUM & ORDER**
25-CV-06781 (NRM)

NINA R. MORRISON, United States District Judge:

      Petitioner Zhi Ming Zhang ("Zhang") is a citizen of China who has resided in the United States since 1992. On May 14, 2012, Immigration and Customs Enforcement ("ICE") placed Zhang on an Order of Supervision, which was regularly renewed until 2025. On February 27, 2025, Zhang presented himself to an ICE field office for a check-in pursuant to his supervised release, and was handcuffed, arrested, and detained. Zhang filed the instant petition for a writ of habeas corpus challenging his detention under the Fifth Amendment and the Administrative Procedure Act, and ordering Respondents Kenneth Genalo, Kristi Noem, and Pamela Bondi ("Respondents") to show cause why he was being detained.

      On December 22, 2025, after several rounds of briefing and supplemental filings, the Court held oral argument on the petition. On December 23, 2025, the Court granted Zhang's petition in a ruling from the bench and ordered his immediate release from custody. This opinion follows to set forth the Court's reasoning for the

record in greater detail.

**BACKGROUND**

## I.    Factual Background

The following facts are principally drawn from the record provided by Respondents and from Respondents' representations regarding that record made at oral argument before the Court.  Unless otherwise indicated, the factual background regarding Zhang's history in the United States and present detention is not disputed.

Zhang is a citizen of the People's Republic of China who entered the United States without inspection on July 8, 1992.  Rocco Kish Decl. ("Kish Decl.") ¶¶ 3–4, ECF No. 15.  He applied for asylum on March 25, 1994, which was denied on February 14, 1997.  *Id.* ¶¶ 4–5.  On January 26, 1998, an Immigration Judge ordered Zhang deported in absentia.  *Id.* ¶ 7; Immigr. Judge's Final Order of Removal dated January 26, 1998, Resp't Ex. A at 2–3, ECF No. 14-1.[1]

On June 9, 2006, Zhang filed a motion to reopen his proceedings, and on August 1, 2006, the Immigration Judge denied the Motion to Reopen.  Kish Decl. ¶ 10.  Zhang appealed that denial, and the Board of Immigration Appeals ("BIA") dismissed the appeal on February 1, 2008.  *Id.*  On October 15, 2008, Zhang filed a second motion to reopen and stay of deportation with the BIA, which was denied on February 5, 2009.  *Id.* ¶ 11.

On April 12, 2012, Zhang was arrested outside his home in Staten Island by

---

[1] Unless otherwise indicated, all page references use the pagination provided by the Electronic Case Filing System.

NYC Fugitive Operations pursuant to a warrant of removal, transported to 26 Federal Plaza for processing, then detained by ICE at Delaney Hall Detention Facility in Newark, New Jersey. *Id.* ¶ 13; Grp. Ex., Resp't Ex. I ("Revocation Documents") at 2–3, ECF No. 14-9. Shortly after, Zhang filed an application for a stay of removal and deferred action on deportation based on his substantial equities in the United States, including being the sole provider of two U.S.-citizen children and a caretaker for his U.S.-citizen mother. Kish Decl. ¶¶ 14, 17; Pet. for Writ of Habeas Corpus ("Pet.") ¶ 25, ECF No. 1. On May 11, 2012, ICE granted the stay of removal for six months. Kish Decl. ¶ 14.

With removal now stayed, on May 14, 2012, ICE released Mr. Zhang under an Order of Supervision ("OSUP"). *Id.* ¶ 15; Order of Supervision dated May 14, 2012, Resp't Ex. E ("OSUP"), ECF No. 14-5. On May 23, 2012, ICE obtained a permit for entry from the Consulate General of China, which was valid for three months from the date of issuance. Kish Decl. ¶ 16. However, because the stay of removal was still in place, Zhang remained in the United States, and the travel document expired in August 2012. *Id.*

ICE continued to renew Zhang's OSUP up until February 2025. Pet. ¶ 2. From December 2017 through January 2025, Zhang reported twice a year to the ICE field office pursuant to the conditions of his OSUP. *Id.*

During this period, Zhang was convicted of two misdemeanor offenses in New York state court. First, on March 16, 2001, he pleaded guilty to criminal mischief under NYPL § 145.00 in New York County Supreme Court, receiving a one-year

conditional discharge and a $120 fine.  Kish. Decl. ¶ 8.  On June 22, 2016, Zhang pleaded guilty to reckless driving under NYVTL § 1212 in Kings County Criminal Court, and he was conditionally discharged and fined $150. *Id.* ¶ 19.

Subsequently, on August 16, 2018, Zhang was arraigned on a federal indictment in the Eastern District of New York, charging him with conspiracy to traffic in counterfeit goods, conspiracy to smuggle goods into the United States, and attempted smuggling, along with 21 other defendants in this and related cases.  Kish Decl. ¶¶ 20–21; Gov. Sentencing Memo, Resp't Ex. H at 1, ECF No. 14-8.  On December 13, 2018, he pleaded guilty to conspiracy to traffic in counterfeit goods and attempted smuggling.  Gov. Sentencing Memo at 1.  Zhang's sentencing was stayed for several years, and he remained out of custody but under supervision, while the prosecution of the other defendants was pending. *Id.* at 2, 8.

On January 27, 2025, while awaiting sentencing in his federal case, Zhang reported to the ICE field office for a routine check-in.  Kish Decl. ¶ 23.  He was told to return one month later.  Pet. ¶ 29.  When Zhang returned to the field office on February 27, 2025 as instructed, an ICE officer handcuffed him, removed his personal property, and took him into ICE custody at 26 Federal Plaza.  Kish Decl. ¶ 24; Pet. ¶ 30.

Respondents have represented, principally through the declaration of Deportation Officer Rocco Kish dated November 6, 2025, that at the time of his detention, Zhang was served with a Warrant of Removal/Deportation, Warning to Alien Ordered Removed or Deported, Notice of Custody Determination, and Notice of

4

Revocation of Order of Supervision signed by Assistant Field Office Director (or "AFOD") Darius Robinson.  Kish Decl. ¶ 24; Amended Memorandum in Opp'n ("Opp'n") at 12, ECF No. 19; Revocation Documents at 1–10.  Zhang disputes that he was in fact provided with these documents at the time of his February arrest.  Pet. ¶ 30.  He also disputes that he was provided with an informal interview with an ICE official, as is required by federal law, *see* 8 C.F.R. § 241.4(*l*)(1), to explain the reasons for his impending OSUP revocation and to provide him with an opportunity to be heard before he was detained.  Pet. ¶ 30.

On March 2, 2025, Zhang was transferred to the Buffalo Service Processing Center in Batavia, New York.  Kish Decl. ¶ 25.  On March 9, 2025, he was transferred to the IAH Polk Adult Detention Center in Livingston, Texas, then to Joe Corley Processing Center in Conroe, Texas on March 17, 2025.  *Id.* ¶¶ 26–27.

On April 7, 2025, the Hon. Brian Cogan of the Eastern District, who was presiding over Zhang's federal criminal case, issued an arrest warrant for Zhang so that he could be sentenced in his pending criminal case.  *Id.* ¶ 28; Arrest Warrant dated April 7, 2025, Resp't Ex. J, ECF No. 14-10.  On June 22, 2025, ICE released Zhang to the custody of the U.S. Marshals Service, who detained him at Metropolitan Detention Center, Brooklyn ("MDC").  Kish Decl. ¶ 29.  On October 22, 2025, Judge Cogan sentenced Zhang to time served, two years of supervised release, a $200 special assessment, $151,261 in restitution, and a $1,030,000 forfeiture money judgment.  *Id.* ¶ 30; Criminal Judgment dated October 24, 2025, Resp't Ex. K at 2–8, ECF No. 14-11.  He was transferred back into ICE custody the following day.  Kish Decl. ¶ 31.

## II.    Procedural History

The morning after sentencing, on October 23, 2025, while still detained in MDC Brooklyn, Zhang filed the instant petition in the Southern District of New York, arguing that his detention violated his Fifth Amendment rights and the Administrative Procedure Act.  ECF No. 1; Supp. Letter to J. Oetken dated December 1, 2025 ("Resp't Supp. Letter to J. Oetken") at 1, ECF No. 26.  About an hour and a half after the filing of the petition, the U.S. Marshals returned Zhang to ICE custody and transferred him to 26 Federal Plaza.  Resp't Supp. Letter to J. Oetken at 1.  Later that day, Zhang was transported to Elizabeth Contract Detention Facility in Elizabeth, New Jersey, where he was detained for the pendency of this case.  Kish Decl. ¶ 31.

Zhang's case was assigned to the Hon. Paul Oetken, who ordered Respondents to file a response to the petition.  Order to Show Cause dated October 23, 2025, ECF No. 4.  On November 6, 2025, Respondents filed their opposition papers, including a declaration from Deportation Officer Rocco Kish dated November 6, 2025, and a number of supporting exhibits.  ECF Nos. 14–16.  Kish has been a Deportation Officer for ICE since June 4, 2023, and was first assigned to this case after the revocation of Zhang's supervision, when Zhang was transferred back into ICE custody and filed the instant habeas petition on or about October 23, 2025.  Kish Decl. ¶¶ 1–2; Tr. of Hearing dated December 23, 2025 ("Tr.") at 24–26.

After a hearing, Judge Oetken ordered supplemental briefing on the issue of whether the Southern District of New York was the proper venue for the case.  ECF

No. 21.  After two rounds of letter briefing, ECF Nos. 22, 24, 26, 28, Judge Oetken ultimately transferred the case to this Court after concluding that Mr. Zhang was in MDC Brooklyn at the time he filed this petition on October 23, Transfer Order dated December 9, 2025, ECF No. 29.

After the case was transferred, this Court noted what appeared to be substantial discrepancies and gaps in the record provided by Respondents.  First, in their opposition memorandum, Respondents included language that was purportedly drawn from Zhang's OSUP, but which was not contained in the copy of the OSUP filed with the Court.  *Compare* Opp'n at 3–4, *with* OSUP at 1; *see* Order dated December 16, 2025 ("Production Order") at 1–2, ECF No. 32.  Second, Kish's declaration cited a "valid travel document from the consulate of China" procured for Zhang on May 23, 2012, but no such travel document had been filed with the Court. Kish Decl. ¶ 16, *see* Production Order at 2.  Third, the Notice of Revocation of Order of Supervision allegedly served on Zhang on February 27, 2025 (the "Notice") stated that "a travel document has been procured to effect [Zhang's] removal from the United States" and that his removal was therefore "imminent."  Revocation Documents at 10.  However, Respondents' papers did not anywhere else suggest that an active travel document had recently been procured, and no copy of any such travel document was filed with the Court.  *See* Production Order at 2.

Finally, and in obvious tension with the Notice prepared for Zhang in February 2025, Respondents continually represented throughout this litigation that ICE was actively in the process of obtaining new travel documents for Zhang to effect his

removal, *see, e.g.*, Opp'n at 2, 6, 15 & 18–19; Kish Decl. ¶¶ 32, 33, but did not present any documentation of communications with Chinese officials or other information regarding the status of that process.  This was despite Respondents' representations to Judge Oetken that "[i]ssuance of the requested travel document [from China] may occur within 7-10 days from the date of the request," and "[r]emoval to China can usually be completed within two weeks of obtaining valid travel documents."  Resp't Supp. Letter to J. Oetken at 1.  As of the date of this Opinion, it has now been 304 days since Zhang's initial detention — *i.e.*, since the time ICE first allegedly informed Zhang that his "removal is now imminent."  Revocation Documents at 10.

On December 16, 2025, the Court directed Respondents to produce the missing documents, or else provide a written explanation for the apparent gaps in the record.  Production Order, ECF No. 32.  On December 18, 2025, Respondents filed a letter with three attachments: (1) the "complete" version of Zhang's OSUP, Resp't Letter Ex. A ("Complete OSUP"), ECF No. 34-2; (2) a May 23, 2012 Chinese travel document for Zhang, Resp't Letter Ex. B ("2012 Travel Document"), ECF No. 34-3; and (3) a letter to the Chinese Embassy in Washington, D.C. requesting travel documents for Zhang, Resp't Letter Ex. C ("Letter to Chinese Embassy"), ECF No. 34-4.  In response to the Court's request to produce the travel document referred to in the Notice, Respondents stated that they were "continuing to confer with agency counsel to clarify what travel document the February 27, 2025 Notice of Revocation of Order of Supervision refers to."  Resp't Letter dated December 18, 2025 at 1–2, ECF No. 34.

On December 19, 2025, Respondents filed a second letter with a supplemental,

unsworn declaration from Officer Kish, who stated that the "Notice of Revocation of OSUP that has been filed as Exhibit I in this matter, refers to the May 14, 2012 travel document that was filed on December 18, 2025 as Exhibit B." Rocco Kish Supp. Decl. dated December 19, 2025 ("Kish Supp. Decl.") ¶ 2, ECF No. 35-1. The declaration also stated that Kish was "informed by ICE headquarters in Washington, D.C. that on December 3, 2025, additional identification verification was requested for [Zhang] from the Chinese Embassy, and the additional information was provided . . . ." *Id.* ¶ 3.

The Court scheduled an in-person oral argument for the petition for December 22, 2025 and directed both Deportation Officer Rocco Kish and Assistant Field Office Director Darius Robinson, who had signed the Notice of Revocation, to appear in order to aid the Court in resolving any remaining confusion regarding the record and to clarify what transpired at the time of Zhang's original OSUP revocation and detention in February 2025. At around 11pm the night before the hearing, Respondents filed a third letter with a second supplemental declaration from Kish. Resp't Letter dated December 21, 2025, ECF No. 36. In this third declaration, for the first time, Kish clarified that he had actually been informed by another person — AFOD Robinson — that "the travel document referenced in the Notice of Revocation of Order of Supervision refers to the travel document from May 14, 2012." Rocco Kish Supp. Decl. dated December 21, 2025 ("Kish Supp. Decl. 2") ¶ 4, ECF No. 36-1. He further asserted that "utilizing an old/expired travel document [] can help confirm identification and nationality of an individual" and that the issuance of the expired

2012 document meant that it was "highly likely" that the Chinese government would issue a new travel document for Zhang at this time.  *Id.* ¶¶ 4, 6.

The rest of Kish's third declaration provided some additional details on ICE's efforts to secure a new travel document for Zhang from Chinese officials.[2]   On November 4, 2025, Kish sent identity verification documents filled out by Zhang to Lionbridge, a translation services company.  *Id.* ¶ 6.  On November 14, 2025, he forwarded the translated documents to ICE's office of Enforcement and Removal Operations.  *Id.* ¶ 7.  Kish was then informed by ICE Headquarters on December 3, 2025, that the Chinese government was unable to verify Zhang's identity and requested further documentation.  *Id.* ¶ 12.  On December 17, 2025, ICE requested the Chinese Embassy to reissue Zhang's previously expired travel document.  *Id.* ¶ 13.  The next day, an email from what appears to be an official from the Chinese Embassy was sent to ICE, noting that the "document" was not issued by the embassy, that it was over ten years old, and advising that ICE seek further verification of its materials from the Chinese government.  Resp't Sealed Ex. at 6, ECF No. 38.  Since then, "Zhang's identity verification remains pending."  Kish Supp. Decl. 2 ¶ 15.

The Court held oral argument on December 22, 2025.  AFOD Robinson and Officer Kish appeared along with Respondents' counsel to clarify certain portions of

---

[2] At Respondents' request, the Court granted leave to file exhibits related to these efforts under seal in order to protect the confidentiality of the individuals involved in these communications and certain related information.  Order dated December 22, 2025.  However, as Respondents relied on certain substantive aspects of these written communications in their opposition to the petition, they are cited here in general terms consistent with what was discussed on the record at oral argument.

the record and to ascertain the basis of their knowledge as to the representations made.[3]

Robinson stated that he did not prepare the Notice of Revocation allegedly served on Zhang, but that he signed it after reviewing the document. Tr. at 8–10. He did not know who prepared the notice in Zhang's case. Tr. at 8. He also did not know which officer served the notice on Zhang, Tr. at 10, and on what date that may have occurred if so, Tr. at 10–11. He did not know whether an informal interview was conducted as required by the regulations, and if so, by whom. Tr. at 11–12. When asked whether he knew that, as of February 27, 2025, the information in the Notice was accurate as to Zhang, Robinson replied, "I believe so." Tr. at 9. However, when asked for the basis of that belief, he responded, "I signed the revocation." Tr. at 9.

The Court also asked Robinson more specifically about ICE's procedure regarding an informal interview for revocations of OSUPs. When asked if he knew whether such an interview had taken place, Robinson responded, "I did see a form that indicated one was completed." Tr. at 11. The Court pointed out that this Alien Informal Interview form (the "Interview Form") stated: "At the interview, the alien made the following oral response regarding the reasons for revocation:," followed by a large white space in the middle of the form, apparently left for the interviewer to fill in. Tr. at 11–12; Revocation Documents at 12. Robinson did not know why the

---

[3] Neither party requested that AFOD Robinson or Officer Kish take the witness stand or be placed under oath, and without objection, the Court relied on their unsworn statements about certain factual matters during the hearing, including the procedural history of Zhang's bond revocation and the status of the government's efforts to effectuate his removal.

space had been left blank on Zhang's form if, in fact, the interview had actually been conducted.  Tr. at 12.

The Court also asked Robinson about the bottom of the form, which looks as follows:

The detainee [did] [did not] provide a written statement.  The detainee [did] [did not] provide any documents.  Any documents provided are attached.

_Signature of Interviewing Officer_

Notice of Revocation at 12.  No such "written statement" or "documents" were referred to or filed by Respondents.  The Court asked Robinson whether he could confirm that the form should be read to instruct the interviewer (or other person with knowledge of what transpired in the interview) to circle either "[did]" or "[did not]" in response to each of the two queries listed — *i.e.*, to indicate whether the detainee either "did" or "did not" provide a written statement or any documents during the interview.  Tr. at 15–16.  Robinson claimed that he was "not sure," stating: "I mean, it's on the form, but I'm not sure if it needs to be circled on the form or not."  Tr. at 16.

Finally, the Court asked Robinson to explain his understanding of the statement in the Notice of Revocation that "a travel document has been procured to affect [*sic*] [Zhang's] removal from the United States."  Tr. at 16–17; Revocation Documents at 10.  Robinson replied, "We'd had [*sic*] procured a travel document from 2012."  Tr. at 17.  When asked to explain why he was so confident that this sentence referred to Zhang's long-expired 2012 travel document, Robinson stated, "That's one

12

of the things I would have took into consideration when I'm signing a revocation." Tr. at 17–18.  When asked further about how he specifically came to be aware of the meaning of that statement back in February 2025, Robinson acknowledged that, in fact, he "d[idn't] remember [in] this particular case how I became aware of that," but only that "[i]n normal practice, that's something I would have considered for revocation." Tr. at 18.

The Court then asked Officer Rocco Kish about certain statements he had made in his three declarations.  Kish explained that he only became familiar with Zhang's case when Zhang came into ICE custody in Elizabeth, New Jersey on October 23, 2025. Tr. at 24–26.  When asked about how he actually knew — as he had stated in his supplemental declaration — that the "travel document" in the Notice of Revocation was in fact referring to the expired 2012 document and not a new travel document, Kish responded, "There was no new travel document when Zhang came back into custody . . . . Reviewing databases and available files, I did discover the expired travel document from 2012." Tr. at 27.  When asked how he could have known — as he had represented to the Court in his second and third declarations — that the preparer of the Notice had similarly been aware of the 2012 travel document and relied on it when preparing the Notice, Kish stated: "Specifically, I'm not sure. I just came to that conclusion based on information I had available to me." Tr. at 27.

The Court then heard arguments by counsel for each of the parties.  The following day, on December 23, 2025, the Court resumed the proceedings and issued an oral ruling, granting Zhang's petition and directing that he be released the same

day.   Minute  Entry  dated  December  23,  2025.   Later  that  day,  counsel  for
Respondents  confirmed  that  Zhang  had  been  released  from  custody.[4]   Letter
Confirming Release dated December 23, 2025, ECF No. 39.

## DISCUSSION

For the reasons that follow, the Court grants Zhang's petition for writ of habeas
corpus.

## I.    Jurisdiction

As a threshold matter, Respondents argue that the Court lacks jurisdiction to
review  Zhang's  habeas  claims  because  of  two  separate  jurisdiction-stripping
provisions of 8 U.S.C. § 1252.  The Court considers each of these provisions in turn.

### A.  § 1252(g)

Respondents  first  note  that  8  U.S.C.  § 1252(g)  deprives  district  courts  of
jurisdiction to review "any cause or claim by or on behalf of any alien arising from the
decision or action by [the Secretary of Homeland Security] to . . . execute removal
orders against any alien under this chapter."  8 U.S.C. § 1252(g); *see* Opp'n at 17–20.
They argue that Zhang's challenge to his detention constitutes such a claim.

This argument is foreclosed by Supreme Court and Second Circuit precedent.
Where, as here, a petitioner seeks to use habeas not to stay his removal, but to

---

[4] As further discussed on the record, since the Court declared the February
2025 OSUP revocation unlawful, the Court released Zhang under the terms of that
prior OSUP, and noted that Respondents were free to re-issue the OSUP to clarify its
terms if necessary (and in addition or in the alternative, could seek additional
restrictions on Zhang's liberty from Judge Cogan if necessary to effectuate his
eventual removal, given that Zhang remains on supervised release in connection with
his recent sentencing).

challenge the lawfulness of his detention, § 1252 does not strip district courts of jurisdiction to review his claims.  The Supreme Court in *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999), clarified that § 1252(g) does not "cover[] the universe of deportation claims," but rather "is much narrower.  The provision applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'"  *Id.* at 482 (emphasis in original).

In *Ozturk v. Hyde*, 136 F.4th 382 (2d Cir. 2025), the Second Circuit found that a challenge to unlawful detention does not fall within one of these "three discrete exercises of 'prosecutorial discretion' covered by § 1252(g)."  *Id.* at 397.  Like Respondents do here, the government in *Ozturk* argued that the petitioner's detention could be said to "aris[e] from" the commencement or execution of removal proceedings.  *Id.*  But the court reasoned that "[e]ven though, 'in a but-for sense,' a claim of unlawful detention might arise from the government's decision to . . . execute a removal, challenges to unlawful detention 'do not "arise from" the government's decision to "execute removal orders" within the meaning of § 1252(g) simply because the claims relate to that discretionary, prosecutorial decision.'"  *Id.* (quoting *Kong v. United States*, 62 F.4th 608, 613 (1st Cir. 2023)).

By contrast, the cases that Respondents cite for their position are inapplicable, as they involve petitioners directly challenging their removals — that is, using habeas proceedings to request a stay of their removal order.  *See* Opp'n at 18–20; *see, e.g.*, *Rauda v. Jennings*, 55 F.4th 773, 776–78 (9th Cir. 2022) (holding that a district court

lacks jurisdiction to "enjoin the government from removing [petitioner] until the BIA ruled on his motion to reopen"); *Troy as Next Friend Zhang v. Barr*, 822 F. App'x 38, 39 (2d Cir. 2020) (summary order) (finding that the district court lacked jurisdiction where the petitioner "sought to stay his removal" through habeas).  None of these cases are like the one before the Court, where a petitioner seeks relief from detention, but does not seek to stay or otherwise challenge his order of removal.

B.  §§ 1252(a)(5) & 1252(b)(9)

Respondents next observe that §§ 1252(a)(5) and 1252(b)(9) provide that "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only," 8 U.S.C. § 1252(b)(9), by a "petition for review filed with an appropriate court of appeals," *id.* § 1252(a)(5).  *See* Opp'n at 20–23. Respondents note that these provisions are even broader than § 1252(g), arguing that the Second Circuit in *Delgado v. Quarantillo*, 643 F.3d 52 (2d Cir. 2011), interpreted § 1252(b)(9) to strip district courts of jurisdiction to review even so-called "indirect challenges" to removal orders.  *Id.* at 55.  Respondents argue that Zhang's detention is an action taken by the United States government in furtherance of his removal, and that a challenge to his detention thus indirectly challenges his removal order.

However, it is well established that "§ 1252(b)(9) 'does not present a jurisdictional bar' where those bringing suit 'are not asking for a review of an order of removal,' 'the decision . . . to seek removal,' or 'the process by

16

which . . . removability will be determined.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 19 (2020) (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 294–95 (2018) (plurality opinion)).  And as the Second Circuit in *Ozturk* clarified, "whether the district court has jurisdiction will turn on the substance of the relief that a plaintiff is seeking," and "[h]ere, [Zhang] seeks release from detention." *Ozturk*, 136 F.4th at 400 (quoting *Delgado*, 643 F.3d at 55).

Zhang's "unlawful detention claims may be resolved without affecting pending removal proceedings. . . . Consequently, even if [his] claims have a relationship to 'pending removal proceedings,' [his] claims do not themselves challenge 'removal proceedings,' and thus § 1252(b)(9)'s channeling function has no role to play." *Id.* at 399 (internal quotation omitted).  As the Supreme Court observed in *Jennings v. Rodriguez*, interpreting all forms of immigration detention as "arising from" removal orders, as Respondents ask this Court to do, would "make claims of prolonged detention effectively unreviewable" and "lead to staggering results."  583 U.S. at 293.

Following these precedents, courts in this circuit have universally held that the jurisdiction-stripping provisions of the INA that Respondents cite do not apply to petitioners like Zhang, who challenge the lawfulness of their detention following revocation of an OSUP.  *See, e.g.*, *Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137, 150–54 (W.D.N.Y. 2025); *Zhu v. Genalo*, --- F. Supp. 3d ----, 2025 WL 2452352, *2–4 (S.D.N.Y. Aug. 26, 2025); *Mata Velasquez v. Kurzdorfer*, 794 F. Supp. 3d 128, 140–42 (W.D.N.Y. 2025). And Respondents have identified no authority to the contrary.  The Court therefore finds that it has jurisdiction to review Zhang's challenge to the lawfulness

of his present detention.

## II.    Merits

Having resolved the question of jurisdiction, the Court holds that Zhang is entitled to habeas relief on two independent grounds.  First, the Court finds that Darius Robinson, the assistant field office director who signed Zhang's revocation of OSUP, lacked the authority to direct Zhang's revocation under 8 C.F.R. § 214.4(*l*)(2). Second, Respondents violated Zhang's procedural due process rights by failing to provide the legally required written notification of the reasons for the revocation of his OSUP before detaining him.

### A. Authority of Assistant Field Office Director Darius Robinson

The parties do not dispute that Assistant Field Office Director Darius Robinson was the individual who signed Zhang's Notice of Revocation.  *See* Revocation Documents at 10.  Zhang argues that Robinson lacked the authority to do so because under 8 C.F.R. § 241.4(*l*)(2), it is the "Executive Associate Commissioner" who has the authority to "revoke release and return to Service custody an alien previously approved for release under the procedures in this section."  Respondents claim, however, that Executive Associate Director[5] Nathalie R. Asher delegated her authority under that provision to assistant field office directors pursuant to an "order" she issued in 2019. *See* Opp'n at 26–27.  Upon review of the filed exhibits, the "order" to which Respondents refer in their Opposition is actually an internal ICE memo

___

[5] The "Executive Associate Director" is today's equivalent of the "Executive Associate Commissioner" named in the regulation.  *See* 8 C.F.R. § 1.2; Opp'n at 27 n.12.

dated July 25, 2019. *See* Delegation Memo, Resp't Ex. L., ECF No. 22-1.

The Court has thoroughly reviewed this delegation memo, and it does not do what Respondents claim it does. In particular, it does not confer on assistant field office directors the authority to *revoke* a noncitizen's order of supervised release. The subject of the delegation memo is "Re-delegation of certain detention and removal authority." Delegation Memo at 1. In the portion describing the delegation of powers under 8 C.F.R. § 241, the memo states that the Executive Associate Director is delegating certain authority "relating to warrants of removal, reinstatement of removal, self-removal, and release of aliens from detention." Delegation Memo at 2. Not listed is any delegation of authority to order detention itself, or revocation of release.

As other courts in this circuit have ruled, "[t]he absence of such a reference is decisive." *Funes v. Francis*, --- F. Supp. 3d ----, 2025 WL 3263896, at *19 (S.D.N.Y. Nov. 24, 2025); *see also Ceesay*, 781 F. Supp. 3d at 161 (noting that the delegation order "does not include the authority to detain noncitizens or to revoke orders releasing them"); *E.M.M. v. Almodovar*, No. 25-CV-08212 (MMG), 2025 WL 3077995, at *6 (S.D.N.Y. Nov. 4, 2025) ("Revocation of release, which is a specific event enumerated elsewhere in the governing regulations, is found nowhere in the list of authorities delegated to assistant field office directors in the Delegation Order.").

Respondents argue that the words "relating to" should be read broadly to include actions not enumerated, including the power to revoke an order of supervision who are subject to removal. But their position conflicts with basic principles of

19

statutory interpretation, under which the omission of a particular item from a list of specifically designated items should be understood as an intentional exclusion of the omitted item. *See John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 393, 405 (2d Cir. 2018) ("[T]he interpretive canon of *expressio unius est exclusio alterius* instructs that Congress's expression of one or several items in an enumerated list typically reflects an intent to 'exclude[] another left unmentioned.'" (quoting *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017))).

Respondents also assert — with no supporting citation — that "ICE has consistently applied the delegation order to permit Assistant Field Office Directors to revoke OSUPs under 8 C.F.R. § 241.4(*l*)(2)." Opp'n at 25. Yet as the *Funes* court noted, "Respondents have not come forward with any of the supporting evidence that one might have expected to exist had ICE in fact intended to delegate such authority to assistant field office directors—for example, pre-issuance memoranda from agency officials addressing the scope of the order before it issued, written communications among such officials, or declarations from percipient witnesses." *Funes*, 2025 WL 3263896, at *19.

Furthermore, as Judge Vilardo observed in *Ceesay*, "the language of section 241.4 specifically limits the power of anyone who is not the Executive Associate Director to revoke release," providing that such "district directors" can revoke release "only when . . . revocation is in the public interest and circumstances do not reasonably permit referral of the case to the Executive Associate [Director]." *Ceesay*, 781 F. Supp. 3d at 161–62 (internal quotation marks omitted) (quoting 8 C.F.R.

§ 241.4(*l*)(2).    Respondents do not allege, and the record does not reflect, that Robinson made such a determination here.  In other words, "even if the term 'district director' might include Robinson's current role as an 'assistant field office director,' which is far from clear, the government has not alleged that Robinson made the requisite findings—explicitly or otherwise—before revoking [Zhang]'s release."  *Id.* at 162.

B. Procedural Due Process

Zhang also argues that Respondents violated his procedural due process rights by failing to follow legally mandated procedures in revoking his release.  He is correct.

"[T]he Fifth Amendment entitles noncitizens to due process of law . . . whether their presence here is lawful, unlawful, temporary, or permanent."  *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020).  "The Supreme Court has been unambiguous that executive detention orders, which occur without the procedural protections required in courts of law, call for the most searching review."  *Id.*  Accordingly, a challenge to "ICE's revocation of [Zhang's release] and detention without providing the required notice and an opportunity to be heard . . . . implicate[s] the Due Process Clause."  *Zhu*, 2025 WL 2452352, at *5; *see also Chipantiza-Sisalema v. Francis*, No. 25-CV-5528 (AT), 2025 WL 1927931, at *3 (S.D.N.Y. July 13, 2025) (holding that ICE's failure to comply with procedures already in place amounts to a denial of due process); *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 495–96 (S.D.N.Y. 2025) (same).  Those basic due process protections apply no less to persons like Mr. Zhang — that is, a non-citizen with a felony criminal conviction who has been served with a

21

final order of removal.

    1.  <u>Procedural Requirements of Section 241.4(l)</u>

As relevant here, 8 C.F.R. § 241.4(*l*) governs "Revocation of release." Section

241.4(*l*)(1) is entitled "Violations of conditions of release" and provides that a non-

citizen who violates conditions of his or her OSUP may be returned to custody. It

then states:

> "Upon revocation, the alien will be notified of the reasons for revocation
> of his or her release . . . [and] will be afforded an initial informal
> interview promptly after his or her return to Service custody to afford
> [him or her] an opportunity to respond to the reasons for revocation
> stated in the notification." 8 C.F.R. § 241.4(l)(1).

8 C.F.R. § 241.4(*l*)(1). The next sub-paragraph, section 241.4(*l*)(2), is entitled

"Determination by the Service." It enumerates four situations in which "[r]elease

may be revoked in the exercise of discretion":

> (i)    The purposes of release have been served;
> (ii)   The alien violates any condition of release;
> (iii)  It is appropriate to enforce a removal order or to commence
>        removal proceedings against an alien; or
> (iv)  The conduct of the alien, or any other circumstance, indicates that
>        release would no longer be appropriate.

*Id.* § 241.4(*l*)(2).

Respondents claim that they were never required to provide Zhang with notice

or an informal interview because Zhang's OSUP was revoked solely pursuant to

§ 241.4(*l*)(2), not § 241.4(*l*)(1). Zhang argues, however, that both subsections apply,

and that his procedural due process rights were violated by Respondents' failure to

follow the clear dictates of subsection (*l*)(1).

Here, too, Respondents' position conflicts with the overwhelming weight of

22

persuasive authority. Courts have consistently found that the procedural requirements outlined in (*l*)(1) equally apply to revocation under (*l*)(2). *See, e.g.*, *Ceesay*, 781 F. Supp. 3d at 164 n.25; *Zhu*, 2025 WL 2452352, at \*5–8 (S.D.N.Y. Aug. 26, 2025); *Funes*, 2025 WL 3263896, at \*14–17; *Perez-Escobar v. Moniz*, 792 F. Supp. 3d 224, 225–26 (D. Mass. 2025); *see also Noem v. Abrego Garcia*, 604 U.S. ----, 145 S. Ct. 1017, 1019 (2025) (Sotomayor, J., statement respecting disposition of the application) (describing 8 C.F.R. § 241.4(*l*) as requiring the Government to provide notice and an informal interview). By contrast, Respondents have cited *no* case in which a court has adopted their novel, dual-track interpretation of § 241.4.

The Court agrees with the reasoning in these other decisions. Respondents argue that the procedural protections outlined in § 241.4(*l*)(1) apply only in situations in which ICE revokes a noncitizen's release, and a violation of a condition of supervised release is the basis for that revocation. But as Judge Rochon explained in *Zhu*, such an argument "is in significant tension with the fact that paragraph (*l*)(2) also covers circumstances where a violation of a condition of supervised release is the basis for revoking a noncitizen's release. This overlap belies the Government's argument that these are two separate processes, and suggests that paragraph (*l*) sets forth a unified set of procedures for the revocation of removal." *Zhu*, 2025 WL 2452352, at \*6 (internal citation omitted).

Further supporting this interpretation is the next provision, § 241.4(*l*)(3), which governs the custodial review process "following the informal interview provided for in paragraph (l)(1)." 8 C.F.R. § 241.4(*l*)(3). "But despite the fact that

23

this subsection cites (*l*)(1) and not (*l*)(2), the review process in (*l*)(3) has been held applicable to *all* noncitizens detained subject to § 241.4, not merely those detained based on a violation of a condition of their release." *Funes*, 2025 WL 3263896, at \*15 (emphasis in original); *see id.* (collecting cases).   Courts have thus already held that the procedural requirements of (*l*)(1) apply to revocations pursuant to (*l*)(2).

Finally, Respondents' position is belied by the actual Notice of Revocation they say that they served on Mr. Zhang. This notice states: "You will promptly be afforded an informal interview at which you will be given an opportunity to respond to the reasons for the revocation." Revocation Documents at 10.  As Judge Engelmayer has pointed out, ICE has been using this language in its form notices of revocation for at least the past eight years. *Funes*, 2025 WL 3263896, at \*16 (citing *Rombot v. Souza*, 296 F. Supp. 3d 383, 385 (D. Mass. 2017)).   "The history of the regulation as implemented by ICE thus belies the agency's recent litigation position . . . that these protections apply only where the revocation is based on violating a condition of release." *Funes*, 2025 WL 3263896, at \*17.  "This suggests that the government's stance that no [notice or] informal interview is required in [Zhang]'s situation is a 'post hoc rationalization[] of past agency action' that should not be given deference." *Ceesay*, 781 F. Supp. 3d at 163 (alteration in original) (quoting *Lockheed Martin Corp. v. Morganti*, 412 F.3d 407, 411 (2d Cir. 2005)).

2.  Adequacy of Zhang's Notice of Revocation

Having established that ICE was in fact obligated to provide Zhang with notice of the reasons for his revocation, the Court now turns to the question of whether

24

proper notice was given.

Respondents have produced a copy of the written "Notice of Revocation of Order of Supervision" allegedly provided to Zhang at the time of his detention on February 27, 2025.  Revocation Documents at 10.  Zhang disputes that he was provided a copy of this notice at the time of his arrest.  Pet. ¶ 30.  However, based on a review of the face of the Notice and the statements of AFOD Darius Robinson and Officer Rocco Kish, the Court concludes that the Notice failed to meet the procedural requirements of § 241.4(*l*).  It therefore need not resolve the question of whether Zhang was actually served with the Notice.

Importantly, § 241.4(*l*) requires that a petitioner "be notified of the *reasons* for revocation of his or her release."  8 C.F.R. § 241.4(*l*)(1) (emphasis added).  The undisputed purpose of this requirement is to give the non-citizen an opportunity to respond to or otherwise contest the reasons for the revocation.  For example, in *Torres-Jurado v. Biden*, No. 19-CV-3595 (AT), 2023 WL 7130898, at *4 (S.D.N.Y. Oct. 29, 2023), the court found that a notice of revocation of release was deficient because it failed to make proper findings that "it was 'appropriate to enforce a removal order,'" and "instead stat[ed] only that 'a travel document appears forthcoming.'"  Similarly, in *Perez-Escobar v. Moniz*, 792 F. Supp. 3d at 226, the court found deficient a notice of revocation where ICE "merely asserted that 'there is a significant likelihood of removal in the reasonably foreseeable future,' that 'the purpose of [Petitioner's] release has been served,' and that 'it is appropriate to enforce the removal order'" without "identify[ing] any specific changed circumstances to support these

25

assertions."

> Zhang's Notice states:
>
> You were released on an Order of Supervision on May 14, 2012. That order is being revoked, because your case has come to a final administrative order of removal and *a travel document has been procured to affect* [*sic*] *your removal from the United States.* Your removal is now imminent, and you currently do not have any appeals or applications pending.

Revocation Documents at 10 (emphasis added).  The sole "reason" given for revocation — in other words, the only changed circumstance cited to explain the revocation of Zhang's OSUP — was ICE's assertion that "a travel document *has been procured* to affect [*sic*]" Zhang's removal.

Zhang argues in his petition that China is one of the 13 countries designated by the DHS as "recalcitrant" for their "systematic refusal to accept its citizens whom the United States has ordered removed."  Pet. ¶ 24.  Thus, if a valid travel document for Zhang had in fact been successfully procured at the time the Notice was allegedly served in February 2025, that would indeed constitute the kind of changed circumstance that could justify a revocation of his supervised release.  However, when this Court ordered Respondents to produce the new travel document that appeared to be referenced in the Notice, they failed to do so.  Instead, Respondents filed an unsworn supplemental declaration from Officer Kish on December 19, who stated that the Notice of Revocation did not actually refer to any current, valid travel document, but instead "refers to the May 14, 2012 travel document."  Kish Supp. Decl. ¶ 2.

Notably, although Robinson signed the Notice, he admitted at oral argument

26

on the petition that he did not actually prepare it, nor did he have any specific memory of reviewing any of the materials regarding Zhang's case at the time he signed the Notice. Tr. at 8–10. And though he affirmatively stated to Kish (and to the Court) that the "travel document" mentioned in the Notice was in reference to the expired travel document procured in 2012, Tr. at 17, Robinson could not provide the basis for that belief, nor did he have any independent recollection of any of the events surrounding the preparation or service of the Notice. Tr. at 17–18. Instead, Robinson acknowledged that he "d[idn't] remember this particular case how [he] became aware of that," and in fact, that the only basis for his statement to that effect in Zhang's case was the fact that "[i]n normal practice, that's something [he] would have considered for revocation." Tr. at 18.

Like Robinson, Officer Kish also could not supply any basis for his current belief that the February 2025 Notice referred to Zhang's expired 2012 travel document. Given that Kish only became familiar with Zhang's case when he was transferred back into ICE custody and filed his habeas petition on October 23, 2025, he naturally did not participate in the preparation or execution of the Notice. When asked how he knew what document the Notice was referring to, Kish responded that he had deduced that knowledge from the fact that no current travel document existed for Zhang at the time of revocation. Tr. at 27. And when pressed on how he could have known whether the preparer of the Notice had a similar understanding, Kish admitted that he was "not sure," and that he "just came to that conclusion based on information [he] had available to [him]." Tr. at 27. The Court further notes that in

27

Kish's second supplemental declaration filed on December 21, 2025, he stated that he derived his knowledge about the intent of the Notice from conversations with Robinson himself, Kish Supp. Decl. 2 ¶ 4 ("According to Assistant Field Office Director Darius Robinson, the travel document referenced in the Notice of Revocation of Order of Supervision refers to the travel document from May 14, 2012."), an explanation distinct from the one he gave at oral argument, Tr. at 27.

In sum, both Officer Kish and AFOD Robinson have readily acknowledged that they have no independent knowledge or recollection of the circumstances surrounding the preparation or issuance of the Notice, much less how or why the statement about the procurement of a travel document for Zhang came to be included in the Notice. And now, over two months after Zhang's petition was filed, Respondents have yet to present the Court with any information from or about the person who actually wrote or prepared the Notice, or who may have explained the basis for the OSUP revocation to Zhang in a subsequent interview, if one was conducted.

Based on that record, the Court finds no evidence, nor any reasonable inferences from the evidence that has been presented, permitting it to credit the Respondents' assertion that the Notice of Revocation dated February 27, 2025 was intended to refer to Zhang's long-expired 2012 travel document when stating that "a travel document has been procured to affect [*sic*] [Zhang's] removal from the United States." Revocation Documents at 10.

Moreover, even if the Court were to credit Respondents' claim that the notice of revocation was intended to refer to the expired 2012 travel document as the basis

for Zhang's revocation, the Notice itself was still legally inadequate. Whatever might be asserted now as to the intended meaning of the referenced "travel document," it remains the case that Respondents' present position is, as an objective matter, an illogical interpretation of the text of the Notice. And it is certainly not information that a person in Zhang's position could reasonably be expected to take away from reviewing the plain text of the Notice.

This is so for several reasons. First, the Court notes the rather obvious fact that a 2012 travel document that has been expired for nearly thirteen years is not able to "[e]ffect [Zhang's] removal from the United States." *Id.* at 10. Indeed, the very next sentence of the Notice is: "Your removal is now *imminent*, and you currently do not have any appeals or applications pending." *Id.* at 10 (emphasis added). That is false. ICE had no valid travel document for Zhang at the time the Notice was served, and ten months later, it still has not secured the necessary travel documents to effect Zhang's removal.

Relying on a summary order from the Second Circuit, *Zheng v. Decker*, 618 Fed. App'x 26, 28 (2d Cir. 2015) (summary order), Respondents argue that the prior issuance of a travel document is a fact upon which ICE can rely in assessing the likelihood of a person's removal, because it makes it more likely that the Chinese government will issue a new travel document. But that does not change the fact that the 2012 travel document itself still cannot "[e]ffect [Zhang's] removal" as the Notice of Revocation plainly states. Furthermore, in *Zheng* — a case decided in 2015 — the "previously issued" travel document in question was still active at the time the case

29

was filed, and was only unable to effect the petitioner's removal because petitioner moved for a stay of his removal. *See Zheng v. Decker*, No. 14-CV-4663 (MHD), 2014 WL 7190993, at *1, 14 (S.D.N.Y. Dec. 12, 2014). By contrast, the 2012 travel document for Zhang expired more than twelve years before the events at issue in this petition. And Respondents' own recent filing further undermines its claim that the expired travel document makes Zhang's removal imminent or can otherwise "[e]ffect" his removal now, given that the U.S. government most recently received an email from a person from the Chinese Embassy highlighting two apparent problems with the 2012 travel document: that (1) "it was not issued by the embassy" and (2) it "was more than 10 years old." Resp't Sealed Ex. at 6.

Finally, whatever might have been the intent of the drafter of the Notice of Revocation, the text of the Notice plainly states that Zhang's removal is (purportedly) "imminent" because "a travel document *has been procured* to affect [*sic*] your removal from the United States." Revocation Documents at 10 (emphasis added). It does not state that a travel document "*had*" been procured, which would be the correct and obvious construction if this phrase actually referred to the expired document procured back in 2012. As such, the Court cannot logically read this sentence as referring to the 2012 Travel Document.

The Court therefore concludes that the statement of reasons given in the Notice of Revocation was based on inaccurate assertions of fact. It is unclear on this record whether the false statements were made intentionally or negligently (for example, because Robinson signed off on a "boilerplate" notice, as Zhang's counsel

30

contended at argument, without any knowledge or consideration of the individual facts and circumstances related to Zhang's likelihood of removal at the time it was issued). But the Court need not resolve that issue today, for it is well settled that a notice that provides factually inaccurate reasons for revocation cannot serve as proper notice under § 241.4, making the revocation of Zhang's OSUP and his resulting detention unlawful. *See Funes*, 2025 WL 3263896, at \*17 (noting that a "statement did not supply the notice required by § 241.4(*l*) . . . . because the acquisition of [petitioner's] passport—which [the deportation officer] testified was the reason for the revocation on September 8—had not yet occurred"); *see id.* (noting that other statements also "do not satisfy § 241.4(*l*)" because the officer's "statements during the check-in as to the agency's reasons for taking [petitioner] into custody also were not accurate"); *see id.* at \*18 (noting that a third statement was also inadequate because "the Notice [wa]s factually inaccurate on fundamental points").

But even assuming *arguendo* that the text of the Notice of Revocation was adequate, the Court would still have still further reason to question whether Respondents had met their burden of proving that Zhang's revocation was lawful. This is because there is no evidence in the record establishing that the meaning of the Notice was explained to Zhang, or that he had an opportunity to the purported reason contained therein. Under § 241.4(*l*), the purpose of a notice of revocation is that the noncitizen "be afforded an initial informal interview . . . to afford the alien an opportunity to respond to the reasons for revocation stated in the notification." 8 C.F.R. § 241(*l*)(1). And as just discussed, the text of the Notice alone was not

31

sufficient to have made Zhang properly aware of the "reasons" for his revocation.

Further, Zhang has contended that he was never given the required informal interview to respond to the Notice of Revocation — and Respondents have not met their burden of establishing that they did.  The sole piece of evidence in the record that an informal interview was offered is the Interview Form provided as part of Respondents' initial submissions.  Revocation Documents at 12.  Although this form was signed by a different ICE official (who did not provide a declaration or other corroboration that the interview took place) and does have Zhang's name on it, the Court's review of this form and the statements of AFOD Robinson do not provide a reliable basis to conclude that the interview was actually conducted, or even offered to Zhang.

The Interview Form states: "At the interview, the alien made the following oral response regarding the reasons for revocation:" and leaves a large blank space to be filled out by the interviewer.  Revocation Documents at 12.  Nothing is written on the form submitted by Respondents.  Robinson did not know why the notes section was left blank.  Tr. at 12.  Additionally, the bottom of the form reads: "The detainee [did] [did not] provide a written statement. The detainee [did] [did not] provide any documents. Any documents provided are attached."  Revocation Documents at 12.  Robinson was also asked about this section, and he claimed that he was not sure about whether the words "[did]" or "[did not]" were intended to be circled by the interviewer to reflect what transpired during the interview itself.  Tr. at 16.

The Court does not find Robinson's response to be credible.  The significance of

32

these bracketed options is evident from the face of the form.  Indeed, counsel for Respondents agreed that a "logical" interpretation — and, in this Court's view, the only reasonable interpretation — was that the person filling out the form is required to indicate "[did]" or "[did not]" for each of the statements, to memorialize what occurred at the time of the informal interview.  Tr. at 43–44.

Thus, it is evident that the informal interview form submitted in Zhang's is incomplete, and raises more questions than it answers about whether Respondents complied with the law at the time of Zhang's revocation.  Neither Respondents' counsel nor the two ICE officers who appeared at argument were able to offer any additional context or information apart from the face of the partially completed form to corroborate their assertion that the informal interview took place.

Finally, although Zhang needed the assistance of a Mandarin interpreter for the proceedings before this Court, neither Respondents nor the ICE officers were able to confirm that an interpreter was present to facilitate either the explanation of the Notice of Revocation or the informal interview, and similarly, there is no evidence in the record to reflect that fact.  Robinson represented to the Court that insofar as he was aware, it was ICE's practice to provide an interpreter when needed for such interviews.  Tr. at 12.  But given the other substantial gaps in the record and the incomplete interview form – including in all areas where a response from Zhang would otherwise be noted — that is an insufficient basis to find that an interpreter was actually present here.  Thus, even if an informal interview was offered or took place, there is no reliable evidence that it was conducted in a way that would have

been intelligible to Zhang and provided him with a meaningful opportunity to respond to the reasons given for the revocation.

For all these reasons, the Court finds that Zhang was not given an opportunity to respond to the reasons for revocation as required by 8 C.F.R. § 241.4(*l*).

Because the Court agrees with Zhang that there are at least two existing independent grounds to grant his petition, it does not reach what the parties have referred to as Zhang's *Zadvydas* claim — that is, his claim that his due process rights were violated by his detention because the lengthy period of detention he has been subjected to following an order of removal has exceeded the period reasonably necessary to effect removal under *Zadvydas v. Davis*, 533 U.S. 678 (2001).

However, should Zhang be re-detained in the future, he has not waived his *Zadvydas* claim.  In any future petition, he is free to argue, as he has already done, that his detention is unlawful under *Zadvydas* given, *inter alia*: the fact that his 1998 removal order is nearly three decades old; his long history of appearance in Court and at all required ICE check-ins; the fact that the government has been unable to effectuate his removal since he was detained on February 27, 2025; and the fact that the none of the record evidence provided by Respondents to date provide any indication that a new travel document will in fact be issued imminently, and instead may indicate that the 2012 travel document is of little to no consequence at the present time.

Nevertheless, in granting Zhang the relief he requests, the Court does not reach any of those issues today; it instead resolves Zhang's petition on the two

independent grounds related to the Notice of Revocation and the requirements of § 241.4(*l*) set forth *supra*. Accordingly, Zhang's petition for a writ of habeas corpus is granted.

## III.    Remedy

Last, the Court briefly turns to the issue of remedy.  At oral argument, Respondents' counsel stated that even if Zhang's habeas claim is meritorious, the proper remedy may not be release, but that Zhang could be kept in detention with instructions for ICE to provide him with the proper procedures that were heretofore absent.  Tr. at 77.  The Court first notes that this case has now been pending for two months, and neither current counsel for Respondents nor their colleagues in the Southern District of New York who appeared before Judge Oetken previously raised this argument.  In any case, it is unpersuasive.

"It is clear, not only from the language of §§ 2241(c)(3) and 2254(a), but also from the common-law history of the writ [of habeas corpus], . . . that the traditional function of the writ is to secure release from illegal custody."  *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973).  "Where a party seeks release beyond 'simple release,' the Supreme Court has held such claims to be 'so far outside the "core" of habeas' that they 'may not be pursued through habeas.'"  *Funes*, 2025 WL 3263896, at *24 (quoting *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 119 (2020)).

Even outside the context of habeas, release would be the appropriate remedy given the Court's finding that ICE did not follow its own regulations when revoking Zhang's liberty.  "It is true that not every violation of an agency's rules necessarily requires a wholesale redoing of the agency action.  But . . . the same is not true 'when

35

a regulation is promulgated to protect a fundamental right derived from the Constitution or a federal statute.'  There can be little argument that ICE's requirement that noncitizens be afforded an informal interview—arguably the most bare-bones form of an opportunity to be heard—derives from the fundamental constitutional guarantee of due process." *Ceesay*, 781 F. Supp. 3d at 164 n.26 (internal citations omitted) (quoting *Waldron v. I.N.S.*, 17 F.3d 511, 518 (2d Cir. 1993)); *see also Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.").

Respondents have not identified any authority supporting their claim that the Court can grant habeas relief on the grounds thus far outlined not in the form of release, but by ordering ICE to perform certain discretionary actions in compliance with § 241.4(l) while the person remains in custody.  And the Court is not aware of any other case in which another court has so found.

This Court thus joins the many other courts in this circuit who have ordered a petitioner's immediate release from detention after finding that ICE violated procedures under § 241.4(*l*) in revoking the petitioner's OSUP, either by failing to provide a legally sufficient notice of revocation, an informal interview, or both. *See Zhu*, 2025 WL 2452352, at *9; *E.M.M.*, 2025 WL 3077995, at *6; *Funes*, 2025 WL 3263896, at *24–25; *Ceesay*, 781 F. Supp. 3d at 170.  "[T]he lawful revocation of [the petitioner]'s supervised release presents a low bar to the Government, and they may yet choose to clear it, but they have not done so on the present record, and accordingly

[Zhang] must be released from custody immediately." *E.M.M.*, 2025 WL 3077995, at *6.

* * *

Finally, before closing, the Court notes additional concerns about the history of this habeas proceeding. Even after being granted three extensions from Judge Oetken, ECF Nos. 9, 11, 13, Respondents omitted crucial exhibits in their initial submission in opposition to Zhang's petition — including, most notably, the 2012 Travel Document that eventually served as their principal justification for the revocation of Zhang's supervised release. And in transferring the case, Judge Oetken noted that "[t]he Government's delay in providing a precise account of Zhang's whereabouts on October 23, 2025 has unnecessarily prolonged the Court's efforts to determine proper venue" — and in turn, unnecessarily prolonged Zhang's unlawful detention. Transfer Order at 3.

Additionally, before this Court, Respondents submitted an unsworn declaration from Officer Rocco Kish that stated, as fact, that the travel document mentioned in the Notice of Revocation "refers to the May 14, 2012 travel document." Kish Supp. Decl. ¶ 3. But as Kish admitted at oral argument, not only did he have no basis for believing that this was a fact known by the person preparing the Notice, Kish himself did not have actual knowledge that this was the case. Instead, his purported belief that the Notice referred to Zhang's long-expired document arose only from his own presumptions and speculation, based on his own review of the available documents nearly ten months after the fact.

37

Similarly, though AFOD Robinson represented to this Court that the Notice of Revocation referred to the 2012 Travel Document, he too could not provide a basis for that knowledge, and admitted to having no independent recollection of reviewing any of the materials in connection with Zhang's case. And even after it became clear that the two ICE officials whom Respondents offered to explain certain facts in the record actually had no personal knowledge of those events, at oral argument, Respondents' counsel repeatedly attempted to shore up the reliability of the their assertions by pointing to various statements in Officer Kish's declarations — despite Kish himself having just admitted to the Court that he had no personal knowledge about the basis for those very statements. *See, e.g.*, Tr. at 30, 36.

As with any party, the Government is expected to make representations and present evidence to the Court that is reliable, reasonably complete, and is not based on mere speculation. That is especially so in cases like these, which concern "the most significant liberty interest there is—the interest in being free from imprisonment." *Velasco Lopez*, 978 F.3d at 851. And here, these lapses resulted in significant confusion and undue delay in effecting Zhang's release from what the Court ultimately found was a plainly illegal detention.

As already discussed, nothing in this Order precludes ICE from revoking Zhang's OSUP in the future, provided that they follow all of the legally required procedures before they do so.[6] As the Court underscored in its oral ruling, however,

---

[6] Nor are Respondents limited to the grounds for revocation that they purportedly relied upon in the (now invalidated) February 2025 Notice. For example, Zhang's OSUP includes a condition that he "not commit any crimes while on this

Respondents are now fully aware that Zhang does not have current, valid travel documents (nor any assurance or information from Chinese officials supporting Respondents' earlier claim that the expired 2012 travel documents will accelerate that process now). They are further aware of an array of additional facts and circumstances that apply to Zhang at present and which may bear on the reasonable likelihood of his removal to China. And Respondents are also on notice as to the governing law and procedures that they must follow to the letter should they seek to revoke Zhang's supervision at some future point in time. Thus, as the Court reminded counsel at argument, should Respondents knowingly fail to comply with those procedures in future proceedings against Zhang, they may risk being held in contempt of court.

## CONCLUSION

For the foregoing reasons, Zhang's petition is granted. Zhang's counsel may make a fee application under the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412, within the time provided by the Local Rules.

---

Order of Supervision," Complete OSUP at 4, and it is undisputed that Zhang pleaded guilty to a federal felony charge of conspiracy to traffic in counterfeit goods and attempted smuggling in December of 2018 while on his OSUP. Notably, however, nowhere in the Notice of Revocation allegedly served on Zhang is this conviction — or any other accusation of criminal activity — mentioned, and neither have Respondents ever claimed that such a fact was explained to Zhang as a basis of his revocation of OSUP.

/s/ Nina R. Morrison
NINA R. MORRISON
United States District Judge

Dated:        December 28, 2025
              Brooklyn, New York